**PROSPER LAW GROUP, LLP**
Gordon F. Dickson, Esq., SBN 136857
Deborah P. Gutierrez, Esq., SBN 240383
6100 Center Drive, Suite 1050
Los Angeles, California 90045
Telephone:  (310) 893-6200
Facsimile:  (310) 988-2930
Email:       deborah@prosperlaw.com

Attorneys for Plaintiff,
Gregory Johnson

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY JOHNSON, an individual, | **Case No. 11-cv-2091-JM-WVG** |
| Plaintiff, | **Honorable Jeffrey T. Miller** |
| vs. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A'S MOTION TO DISMISS THE COMPLAINT** |
| HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR THE ELLINGTON TRUST SERIES 2007-1; BANK OF AMERICA, N.A.; and Does 1 – 10, inclusive, | |
| Defendants. | **Date: March 5, 2012** <br> **Time: 10:00 a.m.** <br> **Ctrm.: 16** |

Plaintiff, Gregory Johnson, in support of his Opposition to Defendants' Bank of America, N.A's Motion to Dismiss the Complaint filed February 17, 2012 (Document #13), the Court take Judicial Notice, pursuant to Rule 201 of the Federal Rules of Evidence, of the following document whose contents can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned: *The Foreclosure in California: A Crisis of Compliance Report* **("Exhibit A")**.

1

1    A court may take judicial notice of public and official records as they are not

2    subject to reasonable dispute and capable of accurate and ready determination. Fed.

3    Evid. R. 201 (b); *see MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

4    1986). The attached report was conducted on behalf of The City and County San

5    Francisco's Office of The Assessor- Recorder. The facts for which the Plaintiffs request

6    judicial notice can and should be judicially noticed because they are "not subject to

7    reasonable dispute," as they are party of a city and state report and come directly from

8    the evaluation of the documents filed with the Office of the Assessor-Recorder. The

9    facts are easily verifiable, as they are taken from public records.

10    Many courts have taken judicial notice of the type of information at issue in this

11    request. *See, e.g., Texas & Pac. Ry. Co. v. Pottor*, 291 U.S. 245, 254 n. 4 (1933),

12    amended on other grounds, 291 U.S. 649 (1934) (taking judicial notice of official

13    reports put forth by the Comptroller of the Currency); *Leradi v. Mylan Laboratories,*

14    *Inc.*, 230 F.3d 594, 597-98 (3rd Cir. 2000) (taking judicial notice of information in a

15    newspaper article); *Blair v City of Pomona*, 223 F.3d 1074 (9th Cir. 2000) (taking

16    judicial notice of an independent commission's report on the code of silence among

17    police officers); *Heliotrope Gen., Inc. v. Ford Motor Co.*,189 F.3d 971, 981 (9th Cir.

18    1999) (taking judicial notice of information contained in news articles); *Clemmons v*

19    *Bohannon*, 918 F.2d 858, 865 (10th Cir. 1990), 5 vacated on other grounds, on reh. en

20    banc 956 F2d 1523 (10th Cir. 1992) (taking judicial notice of government reports and

21    Surgeon General's reports concerning health risk of environmental tobacco smoke); *B.T.*

22    *Produce Co. v Robert A. Johnson Sales, Inc.* (S.D.N.Y. 2004) 354 F.Supp.2d 284, 285-

23    286 (taking judicial notice of U.S. Department of Agriculture report); *Wietschner v.*

24    *Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1108 (N.D. Cal. 2003) (taking judicial notice

25    of press releases issued by the Securities and Exchange Commission); *Del Puerto*

26    *Water Dist. v United States Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D.

27    Cal. 2003) (taking judicial notice of public documents, including Senate and

28

REQUEST FOR JUDICIAL NOTICE IN SIPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A'S
MOTION TO DISMISS THE COMPLAINT

1  House Reports); *Feldman v Allegheny Airlines, Inc.* (D. Conn. 1974) 382 F.Supp. 1271,

2  reversed on other grounds 524 F.2d 384 (2nd Cir. 1975) (taking judicial notice of data

3  contained in President's Economic Report).

4

5  Dated:        February 22, 2012              **PROSPER LAW GROUP, LLP**

6

7                                  By:   /s/ Deborah P. Gutierrez

8                                        Gordon F. Dickson
                                         Deborah P. Gutierrez

9                                        Attorneys for Plaintiffs,
                                         Gregory Johnson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SIPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A'S MOTION TO DISMISS THE COMPLAINT

# EXHIBIT A



OFFICE OF THE
ASSESSOR-RECORDER
SAN FRANCISCO

PHIL TING
ASSESSOR-RECORDER

# FORECLOSURE
## IN CALIFORNIA
### A CRISIS OF COMPLIANCE



SAN FRANCISCO | FEBRUARY 2012

PREPARED BY

# AEQUITAS

Aequitas Compliance Solutions, Inc. | 422 31st Street, Newport Beach, CA 92663 | Phone 949.272.3955 | aequitasaudit.com

# CONTENTS

1. Introduction ........................................................................................................ 1

2. A California Primer ........................................................................................... 2
2.1 Understanding Residential Lending in California ....................................... 2
2.2 Understanding Foreclosure in California ..................................................... 2

3. Why This Is Important ...................................................................................... 3

4. How This Relates to the Foreclosure Settlement ....................................... 5

5. Presentation of Findings ................................................................................. 6
5.1 Assignments ................................................................................................... 6
5.2 Notice of Default ........................................................................................... 8
5.3 Substitution of Trustee ................................................................................. 8
5.4 Notice of Trustee Sale ................................................................................ 10
5.5 Suspicious Activity and Other Issues ....................................................... 11
5.6 MERS Conflicts and Results ...................................................................... 12

6. Conclusion ........................................................................................................ 14

Appendix A - Understanding Securitization ................................................. 16

Appendix B – Methodology ............................................................................... 18

NOTICE: The information contained herein is for informational purposes only and is not legal advice or a substitute for legal counsel. As legal advice must be tailored to the specific circumstances of each case, nothing provided herein should be used as a substitute for the advice of competent counsel.

# 1. Introduction

The City and County of San Francisco's Office of the Assessor-Recorder retained Aequitas Compliance Solutions, Inc. to review 382 residential mortgage loan transactions (the "subject loans") that resulted in foreclosure sales that occurred from January 2009 through October 2011.[1] Over this period, there were 2,405 foreclosure sales. The subject loans thus represent approximately 16% of the total. (See Appendix B – Methodology.)

We analyzed the subject loans to determine the mortgage industry's compliance with applicable laws. Specifically, we focused our analysis on important topics relating to six Subject Areas:

- Assignments
- Notice of Default
- Substitution of Trustee
- Notice of Trustee Sale
- Suspicious Activities Indicative of Potential Fraud
- Conflicts Relating to MERS

Our Subject Areas and the topics we explore therein may not be exhaustive. Nonetheless, we believe our analysis presents an accurate picture of the nature and frequency of the mortgage industry's performance respecting compliance with important aspects of California's non-judicial foreclosure laws.

Overall, we identified one or more irregularities in 99% of the subject loans. In 84% of the loans, we identified what appear to be one or more clear violations of law.

(In this report, we refer to both irregularities and violations as "exceptions").

As Figure 1.1 shows, we found significant exception rates across all Subject Areas.



*Figure 1.1 Loans Exceptions by Subject Area*

Figure 1.2 illustrates the volume of exceptions. The *y-axis* represents the percentage of the subject loans with various exception counts. For instance, "≥1" shows the percentage of subject loans with one or more compliance exceptions. Likewise, "≥5" shows the percentage of subject loans with five or more compliance exceptions. The bars show both exceptions representing clear violations of law and those where the facts identify likely or potential violations.



*Figure 1.2 Loans with One or More Exceptions*

▨ Clear Violations    ▨ Likely or Potential Violations

Figure 1.3 shows the percentages of loans with multiple exceptions across different

---

[1] Throughout this paper, we are offering no opinion on the merits of various legal arguments put forth by the industry or those representing homeowners. We simply report the exceptions found based on publicly available facts and our understanding of applicable regulations. We explain our understanding of such regulations in the discussions alongside the specific exception rates presented herein. It is our goal to present only objective findings of facts.

Subject Areas. The *x-axis* indicates the number of Subject Areas within which a loan had one or more exceptions. For instance, if a loan had exceptions relating to both Assignments and Substitutions, it would fall into the "2 Areas" category.

*Figure 1.3 Loans With Issues Across Subject Areas*



35% of the loans had exceptions in three Subject Areas and 32% of loans had exceptions in four Subject Areas. A loan was almost as likely to have no exceptions as it was to have issues in every Subject Area.

Each of these Subject Areas is addressed more fully below. In the Appendices, we provide a brief overview of the securitization process, as well as describe our methodology for performing our analysis.

# 2. A California Primer

In order to understand the findings of this report and to fully appreciate its significance it is helpful first to have some basic knowledge of residential mortgage lending and the foreclosure process in California.

## 2.1 Understanding Residential Lending in California

Lenders in California rely almost exclusively on "Deeds of Trust" to secure home loans. The Deed of Trust takes the place and serves the use of a mortgage. A Deed of Trust (or "Trust Deed") is an instrument that secures repayment of a loan and customarily contains a *Power of Sale* reposing in the Trustee in the event of default. Deeds of Trust are three-party instruments. The borrower (the "Trustor") grants title to the Trustee for the benefit of the lender (the "Beneficiary"). Technically, the title to the real property passes to the "Trustee," usually a title company, whose job it is to hold the bare legal title as well as to foreclose in the event of a default, pursuant to the Beneficiary's instructions, in the underlying obligation. The Trustee reconveys the title to borrower once the loan is paid in full.

In the event of a default, the Trustee files a Notice of Default; however, in many instances, the Beneficiary will substitute another, new Trustee to handle the foreclosure under a *Substitution of Trustee*.

## 2.2 Understanding Foreclosure in California

In California, lenders can use either the judicial or non-judicial foreclosure process.

Judicial foreclosures require the lender file a civil complaint and record a notice of Lis Pendens. The judicial foreclosure process is much lengthier and requires a court proceeding to be concluded. Further complicating this option, a foreclosed borrower reserves the right to reinstate their loan after the foreclosure sale up to one year after a judicial foreclosure proceeding is completed.

Hence, lenders in California almost exclusively utilize the statutory non-judicial foreclosure process on residential home loans. Also known as a *statutory foreclosure*, non-judicial foreclosures are processed without court intervention, are effectively agreed to by borrowers via the power of sale clause found in the trust deed

and governed by California Civil Code §2924. Generally, lenders begin the foreclosure process by giving the defaulting borrower a "Notice of Default" or "NOD." This is the first document that must be recorded as part of the non-judicial foreclosure process. If the borrower is unable to make payment after three months, the trustee can begin the auction of property by filing and mailing to the borrower a "Notice of Trustee's Sale."

One of the most important differences between a judicial and non-judicial foreclosure is the amount of judicial oversight: in the former the lender sues the borrower while in the latter it is the borrower who has to involve the courts. Furthermore, under the non-judicial foreclosure process homes are sold without court approval. Therefore, the expedited non-judicial foreclosure process frequently results in little, if any oversight.

Indeed, since most foreclosures in California are non-judicial, the borrower has to be the party that brings court oversight to the foreclosure process, if a court is to be involved at all.

## 3. Why This Is Important

We hope this report will achieve two goals. The first is to illustrate and explain foreclosure processing issues in a way that allows everyone—no matter their mortgage knowledge or association with the crisis—to understand them. Second, we hope to open a dialogue on the importance of ensuring compliance with these laws so that corrective action can take place. This means both working productively with the mortgage industry to improve compliance and effecting legislative change so that the law more accurately reflects California's modern mortgage market.

For the most part, Cal. Civ. Code §2924 and California's foreclosure laws generally are concerned with imposing procedural obligations on foreclosing Beneficiaries and providing due process rights to homeowners in order to ensure that the streamlined non-judicial foreclosure process is not abused. Because non-judicial foreclosure is a "drastic sanction" and a "draconian remedy," courts have generally required strict compliance with statutory requirements.[2]

It is worth noting that the process was created long before things such as the secondary market and mortgage brokers existed. When the laws were first enacted, lenders "originated-to-hold" loans for their portfolio and rarely sold mortgage loans.

Many mortgage industry advocates correctly point out that much of Cal. Civ. Code §2924 deals with technical requirements and that inadvertent violations should not provide windfall remedies to reckless borrowers.

While there is much merit to this argument, it ignores legitimate victims for whom Cal. Civ. Code §2924 serves as a last check on abusive lending practices and illegal foreclosures.

Reckless borrowing notwithstanding, much publicly available evidence suggests that there are indeed many legitimate victims of abusive lending and servicing practices.

For example, a remarkable report published by the inspector general for the FDIC reveals that at the peak of subprime originations approximately 83% of FDIC-regulated institutions were cited for patterns of "significant compliance violations."[3] 26% of were violations of the

---

[2] *Miller v. Cote*, 127 Cal. App. 3d 888, 894 (1982).
[3] FDIC, Report No. 06-024, September, 2006

Truth In-Lending Act (TILA) violations. TILA is the cornerstone federal regulation intended to protect consumers from inaccurate and unfair disclosure of the cost of a credit transaction, such as the interest rate and payment schedule of a mortgage loan.

In other words, FDIC-regulated lenders were struggling to accurately and fairly present to borrowers the amount and timing of their required loan payments. Presumably, then, at least some homeowners who suddenly and unexpectedly saw their mortgage payments spike 10% had cause to complain.

We presume these violations were even higher for lenders outside the FDIC's purview. These include the state-licensed, non-depository lenders—such as Ameriquest and New Century—who were responsible for originating 52% of subprime mortgages.[4] News accounts are replete with former employees acknowledging they routinely hid fees, fabricated data and forged documents. There is, for instance, the infamous story of how loan officers for one such lender used "a brightly lighted Coke machine as a tracing board, copying borrowers' signatures on an unsigned piece of paper."[5]

These widespread, though certainly not universal, practices did not stop at the origination stage. In fact, the securitization-spurred boom in originations ultimately made it infeasible to carry out large-scale foreclosures once the market turned.

Evidence of this can found in an April 2011 Interagency Review [6] by the Federal Reserve, OCC and OTS of servicers, which found critical weaknesses in servicers' foreclosure processes and oversight and monitoring of third-party vendors, including foreclosure attorneys. These weaknesses resulted in unsafe and unsound practices and violations of applicable federal and state laws, elevating the agencies' concern that "widespread risks may be presented—to consumers, communities, various market participants, and the overall mortgage market." The servicers included in this review represented more than two-thirds of the servicing market.

Given these well-documented and widespread origination and servicing issues, it is not implausible that there are homeowners who are alleged to have defaulted on loans to which they never fully agreed to and, further, are being foreclosed upon by lenders that might not even own such loans. The fact that these homeowners borrowed something, on some terms, from someone should not be enough to rob them of their due process right.

Importantly, we are not asserting that every distressed borrower is a victim and that the mortgage industry is collectively guilty of defrauding homeowners. Certainly many borrowers knowingly and recklessly overextended themselves. Furthermore, the remarkable growth of the U.S. housing markets is a consequence of, and its future stabilization depends heavily upon, the responsible actions of many of the industry's leading participants.

Rather, we can deduce from the public evidence that there are indeed legitimate victims in the mortgage crisis. Whether these homeowners are systematically being deprived of legal safeguards and due process rights is an important question.

---

[4] Source: Federal Reserve Board based on Home Mortgage Disclosure Act data
[5] "Workers Say Lender Ran 'Boiler Rooms'", *Los Angeles Times* (February 4, 2005)
[6] Interagency Review of Foreclosure Policies and Practices, April 2011

Civ. Code §2924 affords those homeowners certain rights, including in some cases the right to stop or slow foreclosure proceedings. Furthermore, as we shall see, violations of Civ. Code §2924 and California's other foreclosure requirements are sometimes indicative of broader, substantive consumer protection issues.

Therefore, widespread non-compliance with such regulations is a matter that warrants the serious attention of the legislature and the courts.

## 4. How This Relates to the Foreclosure Settlement

This report is being published within a week of the announcement that 49 state attorneys general and the federal government have reached agreement on a joint state-federal settlement with the country's five largest loan servicers regarding some aspects of the servicer's foreclosure practices. It is worth briefly discussing how this report relates to that settlement.

As of the date of this publishing, federal and state officials have not yet made public the agreement and its final wording is still being drafted. However, the general principles are known. The agreement settles only some aspects of the lender misconduct relating to the foreclosure crisis and, with respect to those, does not resolve all legal claims. Consequently, based on our understanding, the settlement does not resolve most of the issues this report identifies, nor immunizes lenders and servicers from a host of potential liabilities arising therefrom.

State and federal authorities can pursue criminal actions and also punish wrongful conduct related to the bundling and sale of mortgage loans into investment securities, among other things. For instance, the

settlement would not release lenders from charges arising under California Penal Code §115, which states that any person who "knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony."

Moreover, the settlement does not provide a release for any private claims by individuals or any class action claims.

All this notwithstanding, if nothing else, this report provides a fuller context for understanding the general nature and extent of the problems precipitating California's participation in the settlement. To our knowledge, this is the first public study to provide a rigorous, quantifiable analysis of foreclosure practices in California.

Until now, public information in California regarding the variety and frequency of improper foreclosures has been largely anecdotal. This is because, as we discussed in Section 3, California's expedited non-judicial foreclosure process results in little, if any, oversight of foreclosing entities. In contrast, states with more rigorous judicial foreclosure requirements have uncovered and exposed patterns of servicer misconduct.[7] The results of this report, therefore, provide the transparency to better understand this important and timely development.

---

[7] See: Office of the Attorney General of the State of Florida, Economic Crimes Division, "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases: Presentation to the Florida Association of Court Clerks and Controllers" (2010). Note that Florida is a judicial foreclosure state.

# 5. Presentation of Findings

In this section we provide detailed findings from our analysis organized by the Subject Areas identified in Section 1.   For each Subject Area (such as Assignments or Notice of Trustee's Sale) we focus on particular topics (such as chain of title issues or timing requirements).   In addition to a Subject Area's overall exception rate (which combines all topics), we show the exception rates and explanatory discussion for each topic.

## 5.1 Assignments

When a lender decides to sell a trust deed to another lender or to a party to a securitization transaction[8], the lender signs an assignment of the deed of trust in favor of the new lender. This assignment typically includes an assignment of the Note the Deed of Trust secures and gives the new lender the same lien on the property that the original lender had under the trust deed. The new lender essentially steps into the shoes of the old lender.

*Figure 5.1 Loans with Assignment Issues*



While we observed a meaningful number of issues relating to Assignments, we focused specifically on five topics: recordation of conflicting assignments, conflicts between federal filings (usually filings with the Securities Exchange Commission) and

recorded documents, Assignments ostensibly executed by the Trustee or Servicer, assignees ostensibly signing for assignors and potential issues relating to Assignments filed subsequent to the Notice of Default.

Overall, 75% of the subject loans contained one or more exceptions relating to these five topics.

A discussion of the five topics and our findings are set forth below. The percentages highlighted in the shaded boxes indicate the exception rate for each topic.



***Recordation Of Conflicting Assignments:*** In 6% of the subject loans, two or more conflicting Assignments of the Deed of Trust were recorded, purporting to transfer ownership of the Deed of Trust to two or more separate entities. For these loans, the conflicting transfers make it impossible for both recorded Assignments to be legally valid. In such cases, there is a strong possibility that neither of the recorded Assignments is legally valid.   At the very least, the conflicting Assignments challenge the power and authority of the entities foreclosing on the property and call into question whether the foreclosing Beneficiary does in fact own the loan.



***Conflicts Between Federal Filings And Recorded Documents:*** In 23% of the subject loans, the foreclosure documents contradict the findings of a securitization audit regarding who is the true, current owner of this loan. Specifically, federal securities data regarding the ownership of the loan contradict the documents filed at the County Recorder's office.

---

[8] See Appendix A for a primer on securitization.



*Assignments that are ostensibly executed by the Trustee or Servicer:* 27% of the time we found evidence to suggest that the original or prior owner of the loan may not have signed the Assignment and that it instead was improperly signed by an employee of the Servicer or Trustee. We suspected this because the name of the person that executed the Assignment of the Deed of Trust was verified to be an employee of the Trustee or the Servicer. The original owner or a subsequent owner of the loan must execute the Assignment of the Deed of Trust. It is unlikely that an employee of the Trustee or the Servicer was a prior owner of the loan. Moreover, it is unlikely that the employee of the current entity claiming to be Beneficiary was, in fact, an agent of a prior owner, as this suggests the prior owner signed an unrecorded document granting authority to assign the Deed of Trust rather than simply signing the Assignment itself. More likely, the chain of title to such loans has been broken and the written transfers from the original owners to the current entities claiming to be Beneficiary do not exist. The possible undocumented or, worse, nonexistent transfers of the loan may explain why the prior, known owner of the loan did not execute the Assignment.



*Assignees Ostensibly Signing For Assignors:* Additionally, 11% of the time we found evidence to suggest the prior owner of a subject loan may not have signed the Assignment and that instead the assignee signed also as assignor. This is suspected because the name of the person that signed the Assignment as assignor was verified to be an employee of the entity claiming to be the current Beneficiary. (Note that this differs from the topic examined immediately above. Above, the Substitution appears to be executed by the

Trustee or Servicer. Here, simply put, an apparent employee of the buyer of the loan has executed the assignment on behalf of the seller.) The original owner or a properly assigned subsequent owner must execute the assignment of the Deed of Trust. It is unlikely that an employee of the entity claiming to be the current Beneficiary was also a prior owner of the loan. Moreover, it is unlikely that the employee of the current entity claiming to be Beneficiary was an agent of a prior owner, as this suggests the prior owner signed an unrecorded document granting authority to assign the Deed of Trust rather than simply signing the Assignment itself. More likely, the chain of title to this loan has been broken and the written transfers from the original owners to the current entity claiming to be Beneficiary do not exist. The possible undocumented transfers of this loan may explain why the prior known owner of the loan did not execute the Assignment.



*Potential Issues Relating to Assignments Filed After The Notice Of Default:* For 59% of the subject loans, an Assignment of the Deed of Trust was filed subsequent to the Notice of Default. Therefore, the persons filing the Notice of Default claimed at that time to represent one purported Beneficiary and then, subsequently, stated that the actual Beneficiary was another person/entity. It is possible that the order and substance of these notices caused a failure to comply with Cal. Civ. Code §2923.5. This could indicate that the Notice of Default was not executed under the proper authority of the true Beneficiary of this loan. Cal. Civ. Code section §2924(a)(1)(C) expressly requires that a Notice of Default include "A statement setting forth the nature of each breach actually known to the beneficiary." Furthermore, the Notice of Compliance attached to the Notice of Default may not meet the requirements of Cal. Civ. Code

§2923.5 because that statute requires the actual Beneficiary of the loan to attempt to discuss alternatives to foreclosure with the Borrower. It should be noted that while the new Beneficiary came to light late in the foreclosure process, the new Beneficiary may have purchased the loan years before the Assignment was recorded.

## 5.2 Notice of Default

Before commencing the foreclosure process, California requires the recordation of a Notice of Default in the county in which the property is located. Importantly, a lender is not required to record a Notice of Default simply because one or more payments are not met. In fact, a lender may decide not to record the Notice of Default until after a loan is in substantial default—sometimes six months or more past due. However, a Notice of Default must be filed to set California's non-judicial foreclosure process in motion.

 Pursuant to Cal. Civ. Code §2923.5, lenders are required to first contact the borrower "in person or by telephone" to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure," thirty (30) days prior to recording a Notice of Default against a property. We found that 6% of the foreclosures did not comply with Cal. Civ. Code §2923.5 because no affidavit attesting to compliance was file.

§2923.5 was enacted in 2008 to encourage communication between lenders and borrowers prior to commencement of non-judicial foreclosure. The extent of the private right of action for non-compliance is limited to obtaining a postponement of an impending foreclosure to permit the lender to comply with the statute. In cases where a foreclosure sale has already been held,

noncompliance does not affect the title to the foreclosed property, as the Legislature did nothing to affect the rule regarding foreclosure sales as final. Therefore, if the property is sold to a bona fide purchaser for value, there is a significant chance that the homeowner will have waived this defect and lose the property.[9]

## 5.3 Substitution of Trustee

In most instances, the original Beneficiary will substitute another trustee to handle the foreclosure under a *Substitution of Trustee*. Substitute trustees are typically firms that specialize in default servicing needs and foreclosure processing.

Where there is a successor Trustee, there can be no valid non-judicial foreclosure where the trustee under the original deed of trust is not properly substituted with a "recorded" document. To avoid confusion and litigation, there cannot be at any given time more than one person with the power to conduct a sale under a Deed of Trust. Therefore, failure to execute or record a Substitution of Trustee is a substantial defect and impacts a right afforded to borrowers to know whom the Trustee is that will sell their property at a foreclosure sale. As such, the sale may be void.

While we observed a meaningful number of issues relating to Substitutions of Trustee, we focused on four topics: invalid Substitutions subsequent to the Notice of Default, Substitutions recorded subsequent to the filing of the Notice of Trustee Sale, Substitutions executed by an entity other than the Beneficiary and other suspicious executions.

---

[9] See *Mabry v. The Superior Court of Orange County*, No. G042911 (June 2, 2010)

Overall, 85% of the subject loans contained one or more exceptions relating to these four topics.

A discussion of the four topics and our findings are set forth below. The percentages highlighted in the shaded boxes indicate the exception rate for each topic.

*Figure 5.33 Loans with Substitution Issues*



 ***Substitution is Recorded Subsequent To The Filing Of The Notice Of Trustee Sale:*** We found that 3% of the time the Substitution of Trustee was recorded after the Notice of Trustee's Sale was recorded. Such action is a violation of Cal. Civ. Code §2934a and may invalidate the foreclosure documents filed by the new Trustee. Cal. Civ. Code §2934a requires that only the original trustee or a properly substituted trustee has the power to file a Notice of Trustee's Sale and actually sell a property at a Trustee's sale. Under this statutory provision, the Substitution of Trustee must be filed prior to or currently with the Notice of Trustee's Sale. If a Substitution of Trustee is never properly filed in the County Records office, then the current purported Trustee may not have the authority to foreclose on the subject property. An incorrect Substitution of Trustee or failure to file a Substitution of Trustee could invalidate the foreclosure process. While there is a relatively small exception rate associated with this topic, such violations in combination with exceptions elsewhere suggest the possibility of fraud and should be investigated accordingly.

 ***Invalid Substitutions After The Notice Of Default:*** In 18% of the subject loans the Substitution of Trustee was not executed in compliance with Cal. Civ. Code §2934a therefore the Substitution and any document filed by the new Trustee may be invalid. The Substitution of Trustee was recorded after the Notice of Default was recorded, but the required Declaration of Mailing was not included as required by Cal. Civ. Code §2934a (b) and (c). The Substitution of Trustee is defective and, therefore, any documents signed by the new Trustee lack proper authority and any sale of the underlying property may be void. It's worth noting that we are not presuming that the Substitution was never actually mailed to the homeowner; rather, we are concluding that a valid Substitution of Trustee was not effectuated because the statutory requirements were not met.

***Substitution Executed By An Entity Other Than The Beneficiary:*** For 85% of the subject loans, the Substitution of Trustee was not executed by the Beneficiary of the loan. Therefore, the instrument may be invalid unless it was signed with the express authority of the Beneficiary. Specifically, the original lender or a properly assigned beneficiary did not execute the Substitution of Trustee. Cal. Civ. Code §2934a (a)(1) states that only the current Beneficiary of the loan has the authority to execute a valid Substitution of Trustee. Therefore, a successor Trustee must be appointed by the original Lender or a properly assigned Beneficiary. If the new

Trustee was not appointed by the current Beneficiary, the new trustee does not have the authority to foreclose on the subject property or execute the statutorily required notices. Careful verification that the entity that executed the Substitution of Trustee is the actual owner of the loan is critical to a determination of whether the Substitution of Trustee is valid.

 ***Other Suspicious Executions of Substitution:*** In 28% of the subject loans, we found reason to suspect the execution of the Substitution was unauthorized. Specifically, there were questions as to whether the Substitution of Trustee was signed by a person who is an actual employee of the entity executing the Substitution. Pursuant to Cal. Civ. Code §2934a (a)(1), a Substitution of Trustee may only be validly executed by the Beneficiaries under the Deed of Trust or their successors in interest. This suggests that an employee or agent of a duly authorized company purporting to execute the Substitution of Trustee must actually sign the document. In these cases, the individuals signing the Substitutions of Trustee were not actual employees of the companies purporting to execute the Substitution. This information was verified through a database with the names of employees of several Trustee companies that frequently sign foreclosure documents. The entity that executed the Substitution may claim that it acted as the agent of the Lender or Beneficiary. However, if this is not the case (as has frequently been shown), any unauthorized execution may invalidate the Notice of Default and Notice of Trustee's Sale.

## 5.4 Notice of Trustee Sale

The Notice of Trustee's Sale (NOTS) serves as public notice that the auction of the property will be taking place. The Notice of

Trustee's Sale can be recorded three (3) months after recording the Notice of Default. The trustee sale date must be no earlier than 20 days after Notice of Trustees Sale is recorded.

While we observed a meaningful number of issues relating to the Notice of Trustee's Sale, we focused on three topics: early filing of NOTS, early actual or planned sale and the NOTS not executed by authorized Trustee.

Overall, 42% of the subject loans contained one or more exceptions relating to these three topics.

*Figure 5.4 Loans Notice of Trustee's Sale Issues*



A discussion of the three topics and our findings are set forth below. The percentages highlighted in the shaded boxes indicate the exception rate for each topic.

 ***Early Filing of NOTS:*** 2% of the time the Notice of Trustee's Sale was not filed in compliance with Cal. Civ. Code §2924 because three months did not elapse since the Notice of Default was recorded. The Notice of Trustee's sale was recorded less than three months after the Notice of Default was recorded in the official County Records. Failure of the trustee to give the homeowner the statutorily required time to cure the default is a violation of the homeowner's due

process rights. Generally, absent any other wrongdoing, the practical consequence of this violation is to delay the foreclosure proceedings until all notices are properly filed and timing requirements met.

 ***Early Actual or Planned Sale:*** In 10% of the subject loans, the actual or planned sale of the property was scheduled less than 20 days after the Notice of Trustee's Sale was recorded. A sale of the property by the Trustee may not occur until twenty days after the Notice of Trustee's Sale is executed and given to the homeowner. In the case of the affected loans, the Cal. Civ. Code §2924(f) notification requirements were not met and/or the Trustee did not wait until twenty days after the Notice of Trustee's Sale was recorded to sell the property. Non-compliance with the timing requirement may invalidate the foreclosure sale or delay the sale. Failure of the Trustee to give the homeowner the full 20 days to respond to the notice of sale is a violation of the homeowner's due process rights.

 ***NOTS not executed by authorized Trustee:*** 34% of the time the original Trustee or a properly substituted Trustee did not execute the Notice of Trustee's Sale. Therefore, the Notice of Trustee's Sale was not executed by the proper Trustee. This should void the Notice and any Trustee's Sale by that entity. The Deed of Trust and California foreclosure statutes give exclusive power to the original Trustee or a properly substituted Trustee to file a Notice of Trustee's sale and sell the property at a Trustee's sale (see Section 5.3). Because the authorized Trustee did not execute the Notice of Trustee's Sale, the Trustee's sale may be void.

## 5.5 Suspicious Activity and Other Issues

Charges that some of the largest mortgage servicers are engaged in fraudulent practices continue to be made. These practices include: fabricating documents that should have been signed years ago and submitting them as evidence to foreclose on homeowners, back-dating documents and robo-signing (using fake signatures to power through foreclosure documents).

It is sometimes difficult to prove fraudulent practices with certainty. However, by reviewing documents and signatures against public and proprietary databases, we were able to identify numerous specific instances potential abusive practices. We refer to these instances as "Suspicious Activity."

While we observed a meaningful number of issues relating to Suspicious Activity, we focused on three topics: "strangers" to the deed of trust purporting to be Beneficiaries, back-dating of documents and incorrectly executed documents.

Overall, 82% of the subject loans contained one or more exceptions relating to these three topics.

*Figure 5.5 Loans with "Suspicious Activity"*



A discussion of the three topics and our findings are set forth below. The percentages highlighted in the shaded

boxes indicate the exception rate for each topic.

 *"Strangers" to the Deed of Trust Purporting to Be Beneficiaries:* For 45% of the subject loans, the property securing a loan was sold at auction to an entity that is claiming to be the Beneficiary of the Deed of Trust when that entity is not the original Beneficiary and either (1) no Assignment of the Deed of Trust was ever recorded granting a beneficial interest to that entity or (2) such assignment was recorded *after* such sale. In other words, a "stranger" to the Deed of Trust purported to be the foreclosing Beneficiary of the subject property and was granted ownership of said property at the Trustee's Sale. This entity was not the original Beneficiary of the Deed of Trust and no assignment of the Deed of Trust has been recorded assigning the beneficial interests of the Deed of Trust. This is an issue because such entities do not convey any money for the subject property, but instead made a credit bid at the auction. The California foreclosure statutes state that only the Beneficiary of the Deed of Trust can make a credit bid at a foreclosure auction. Without proof of the ownership of the beneficial interests in the Deed of Trust, the entity that was granted ownership of the subject property may not have good title to the property and the Trustee's Sale to this unauthorized "stranger" may be invalid. The fact that an Assignment of the Deed of Trust was never recorded could indicate that the chain of title for such loans cannot be established. Further, only foreclosing beneficiaries have the right to be exempt from the payment of transfer taxes charged by government agencies. If the foreclosing party was not, in fact, the foreclosing beneficiary then the transaction may involve the unlawful evasion of taxes.

*Back-Dating Of Documents:* We found evidence in 59% of the subject loans that one or more of the foreclosure documents recorded against the subject property were back-dated (i.e. there is a time discrepancy between the document date and the notary's date or the recording date). Creating a false date of signature is a potentially serious issue as many of these documents carry penalties for perjury or other violations of California's Penal Code. It should be noted that there may have been a legitimate reason for the discrepancy between the document date and the recording date, such as the document was properly executed but mishandled prior to recordation.

 *Incorrect Execution of One or More Documents:* In 10% of the subject loans we found instances where one or more of the foreclosure documents were incorrectly executed for reasons other than those already discussed above. A natural person must sign each document recorded in the foreclosure process, including all Assignments, Substitutions of Trustee, the Notice of Default and the Notice of Trustee Sale. Documents not bearing signatures of natural persons may be invalid.

## 5.6 MERS Conflicts and Results

The Mortgage Electronic Registration System (MERS) is a private corporation that tracks the ownership interests and servicing rights in mortgage loans, allowing the parties to the securitization process (described in Appendix A) to buy and sell the loans without having to record transfers with the county.

Mortgage Electronic Registration Systems, Inc. and MERSCORP, Inc. were created by Fannie Mae, Freddie Mac, Ginnie Mae, the Mortgage Bankers Association of America

and large mortgage banks to provide an electronic registry for tracking ownership interests and servicing of mortgage loans. MERS played a unique role during the advent and subsequent boom of the securitization market for residential mortgage loans.

MERS members can sell mortgage loans without having to record each transfer in county offices thus eliminating the need for frequent recorded assignments of mortgages and deeds of trust. MERS asserts to be the owner (and the owners agent) of the security interest indicated by trust deed and registers assignments of beneficial interests through its system.

MERS maintains that by eliminating the need to file assignments in the County Records it lowers costs for lenders and consumers by reducing county recording fee expenses resulting from real estate transfers. MERS further maintains that it provides a central source of information and tracking for mortgage loans, although a transfer between two MERS members is effectively unknown to those outside the MERS system.

The scope of this segment of our investigation involves the disclosure of the investor (Beneficiary) as named in the MERS system versus the investor (Beneficiary) information as named on the Trustee's Deeds upon Sale and/or Assignments of Deeds of Trust that have been recorded in the San Francisco County Recorder's Office.

A Trustee's Deed Upon Sale must name a foreclosing beneficiary, who is the grantee of the beneficial interest under the Deed of Trust. We compared this information to the investor information indicated in the MERS system. All entities that did not match the MERS database were identified as conflicts.

The foreclosing beneficiaries as named in the Trustee Deeds were either entered as a "wildcard" grantee (that is a foreclosing beneficiary grantee whereby there was no assignment to that entity) or the foreclosing beneficiary grantee was named subsequent to a sale by an assignment. In either case, if this entity was different than the investor as named in the MERS database a conflict was tallied.



*Figure 5.6-A MERS Conflicts with TDUS*

Investor information was available from the MERS database on 192 of the 382 subject loans. The investigation resulted in 112 loans whereby the beneficiary as entered on the Trustee's Deed upon Sale conflicted with the investor information present on the MERS database. This is a 58% failure rate.

In addition to investigating conflicts between MERS and the County Records, we also analyzed the MERS-registered loans separately from the Non-MERS loans across all Subject Areas (excluding MERS Conflicts, which of course only includes MERS loans). As Figure 5.6-B illustrates, MERS-registered loans had a higher exception rate in each Subject Area.

*Figure 5.6-B Comparing MERS Loan Exceptions Rates*



What is at stake here is more than merely fairness and minimal due process. Foreclosures impact not only homeowners but also entire communities and housing markets. The integrity of California's record title system is also at stake because the validity of title for subsequent purchasers is dependent on those that precede it.

As always, it is important to keep in mind that correlation does not imply causation. Indeed, there are many possible explanations for the correlation between a loan's exception rates and whether it is MERS-registered.

Securitization practices may be a significant causative variable explaining these results. In general, MERS loans are more likely to be securitized. Indeed, facilitating the multiple sales and assignments required by the securitization process is a primary objective of MERS. As Appendix A shows, securitization involves multiple transactions among multiple parties, creating more opportunities for error and introducing moral hazard among various parties with different interests. On the other hand, loans originated for a lender's portfolio do not present the same issues.

Another possible explanation is that beneficiaries relying on the County Records, as opposed to the private MERS registry, are more likely to ensure that all legal instruments are valid, executed and retained.

The mortgage industry, for its part, asserts it is taking vigorous steps to work at its shortcomings. The paradox is that the foreclosure crisis has been caused by their successes as much as their failures. During the boom, poor underwriting and documentation standards made possible the blistering rate of originations and securitizations. While it invested heavily in production, the mortgage industry did not apply commensurate resource and ingenuity to the quality control and servicing function. Consequently, outmoded infrastructure and incomplete, or missing, loan documentation made it infeasible to carry out large-scale foreclosures.

As regards the current crisis, it is difficult to imagine how the industry can cost-effectively solve these problems *ex post facto*. Going forward, however, much can be done to improve the entire mortgage loan value chain in order to mitigate the potential for these failures to recur in the future.

So far as public policy is concerned, supervisory and enforcement activity will likely increase until the industry can demonstrate the weaknesses and deficiencies in its foreclosure practices have been corrected. But, here too, there is much looking to be had in the mirror. California's real estate laws were designed to address a far simpler, much different market. The mortgage industry has since seen remarkable

# 6. Conclusion

If there is one lesson to take away from this report it is that, with so many homes being foreclosed and with so little oversight, California's foreclosure process appears utterly broken.

innovation. Considering the extent and consequence of the issues, perhaps it is time for the legislature to be similarly innovative. Ensuring clear chains of title and the integrity of California's record title system are essential to the recovery and stabilization of the state's housing market. Similarly, California's hoary statutory foreclosure process is complicated by outmoded assumptions and problematic ambiguities. It is in the best interest of all—the mortgage industry, securities investors, homeowners and communities—to modernize California's real estate laws so that these issues are more effectively addressed.

It is not yet clear that the underlying problems that made possible the catastrophic failures and tragedies wrought by the foreclosure crisis have been solved. On this will depend the chances of a recovered mortgage market and a salvaging of the American Dream.

# Appendix A - Understanding Securitization

It is important to have a general familiarity with mortgage securitization in order to understand the foreclosure process. Securitization involves a series of conveyances of the note evidencing the residential loan and assignment of the mortgage or trust deed securing it. Therefore, chain of title and beneficial interest issues frequently turn on the securitization trajectories.

*Securitization* is the process pooling loans into "mortgage-backed securities" or "MBS" for sale to investors. MBS is an investment instrument backed by an undivided interest in a pool of mortgages or trust deeds. Income from the underlying mortgages is used to pay interest and principal on the securities. Figure A below is a simplified schematic depicting the general securitization process and some of the parties involved.



Figure A - Securitization Schematic

The process begins with *Originators,* which are the lenders (such as banks or finance companies) that initially make the loans to homeowners. *Sponsor/Sellers* (or "sponsors") purchase these loans from one or more Originators to form the pool of assets to be securitized. (Most large financial institutions are both Originators and Sponsor/Sellers.) A *Depositor* creates a *Securitization Trust,* a special-purpose entity, for the securitized transaction. The depositor acquires the pooled assets from the Sponsor/Seller and in turn deposits them into the Securitization Trust. An I*ssuer* acquires the Securitization Trust and issues certificates to eventually be sold to investors. However, the Issuer does not directly offer the certificates for

sale to the investors. Instead, the Issuer conveys the certificate to the Depositor in exchange for the pooled assets. An *Underwriter*, usually an investment bank, purchases all of the certificates from the Depositor with the responsibility of offering to them for sale to the ultimate investors.

What is first important to understand is that to effect the securitization process both the note and trust deed (the security interest) must be assigned from the Originator to the Sponsor/Seller, then from the Sponsor/Seller to the Depositor and, finally, from the Depositor to the Securitization Trust. Each assignee, up until it makes an assignment to the next party along the chain of title, is the beneficiary under the trust deed. There is a break in this chain of title where an assignment is not made or is otherwise invalid.

Also worth noting is that almost all Securitization Trusts elect to be treated as "Real Estate Mortgage Investment Trusts" or "REMICS" pursuant to the rules and regulations of Sections 860A-F of the Internal Revenue Code ("IRC"). Consequently, a Securitization Trust must adhere to certain strict and absolute requirements involving transfers of assets into the trust. The IRC 860 outlines these requirements, which include a condition that all loans that are stated to be in the REMIC trust must be acquired on the startup day of the trust or within three months thereafter. Any other contributions to the REMIC after the startup date or the subsequent 90-day window are treated as a "prohibited transaction". A prohibited transaction is catastrophic to a Securitization Trust as it subjects the entire cash flows of the trust to a minimum 100% tax. For this reason, all parties to a Securitization Trust must strictly adhere to the rules of the trust's Pooling and Servicing Agreement and the Mortgage Loan Purchase Agreement, especially the guidelines regarding conveyances (and assignments) of the assets.

# Appendix B – Methodology

The City and County of San Francisco's Office of the Assessor-Recorder randomly selected 382 residential mortgage loan transactions (the "subject loans") that resulted in foreclosure sales that occurred from January 2009 through October 2011.  The subject loans included all San Francisco zip codes and comprised proportionally more loans in areas that had a higher rate of foreclosure.  Over this period, there were 2,405 foreclosure sales.  The subject loans thus represent approximately 16% of the total.

We reviewed all recorded documents.  We likewise collected and reviewed extensive information using other public resources, including federal filings (usually filings with the Securities Exchange Commission).  Finally, we utilized public and proprietary databases to assist in identifying suspicious activity (such as robo-signing or other execution issues).

The loan reviews were performed by experienced mortgage and legal professionals, utilizing a proprietary rules-based auditing software developed by attorneys expert in mortgage origination, securitization and foreclosure laws.

## About Aequitas

Aequitas Compliance Solutions, Inc. ("Aequitas") is a mortgage regulatory compliance consulting firm specializing in complex litigation, investigation and internal audit issues. We work with the mortgage industry and its stakeholders providing accurate, thoughtful and customized analysis, which we present in a clear and persuasive manner. Our experts possess a broad range mortgage and regulatory expertise which enable us to serve large and small companies, law firms and regulators.

## Contact

*For questions related to the findings presented herein:*

Lou Pizante
949.272.3955
lou@aequitasaudit.com

*For copies of this paper:*

Mark Rapparport
949.272.3955
research@aequitasaudit.com

*For media inquiries:*

Barbara Caruso, APR
Caruso Communications
714.841.6777
carusocom@aol.com

**Lou Pizante** is a partner at Aequitas where he leads the firm's Regulatory Compliance & Litigation Support practice. Mr. Pizante has more than 15 years experience in mortgage regulation and capital markets. Prior to Aequitas, Mr. Pizante was CEO of Mavent Inc., currently a subsidiary of Ellie Mae, the leading provider of automated regulatory compliance solutions for the mortgage industry. Mr. Pizante has held positions with RBS Securities Inc., Nomura Asset Capital and Goldman Sachs. Mr. Pizante is a frequent author and speaker for various mortgage industry publications and conferences. He holds a bachelor's degree from the University of California at Berkeley and a master's degree and a juris doctorate from New York University. Mr. Pizante is a member of the California Bar Association. He has been recongnized as a Future Leader by the Mortgage Bankers Association.

**Mark Rapparport** is a partner at Aequitas where he leads the firm's Forensic and Investigative Services practice.

**Jay Patterson** is the owner of Full Disclosure, LLC. Mr. Patterson is a forensic accountant and credentialed Certified Fraud Examiner. He is recognized nationally as one of only a handful of professionals that provide forensic and investigative accounting, examination and analyses related to the areas of mortgage loan servicing and securitization. He has been designated as an expert witness in several court jurisdictions around the country, developed methodologies that are used in the forensic examination and analyses of mortgage loan servicing and securitization transactions. His clients are attorneys and governmental entities. He is a frequent speaker and instructor at various mortgage servicing and securitization seminars and is currently involved in several landmark mortgage related cases. Mr. Patterson is a native of Texas and currently resides in Hot Springs National Park, Arkansas.

**Aaron Sheffield** is Associate Counsel at Aequitas and is responsible for audit and quality supervision. Mr. Sheffield holds a bachelors degree from the Univeristy of Kentucky and a juris doctorate from Pepperdine University School of Law.

*The authors would like to thank Phil Ting, Benjamin Weber and Walter Hackett for their excellent assistance.*

© 2012 Aequitas Compliance Solutions Inc. All Rights Reserved.

## PROOF OF SERVICE

### Gregory Johnson vs HSBC Bank USA, National Association, et al.
### United States District Court – Southern District of California Case No. 3:11-cv-2091-JM-WVG

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 6100 Center Drive, Suite 1050, Los Angeles, California 90045. On February 23, 2012, I served the following document(s) by the method indicated below:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A'S MOTION TO DISMISS THE COMPLAINT**

[X]   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date on postage meter date is more than one day after the date of deposit in this Declaration.

[ ]   by placing the documents(s) listed above in sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth below. A signed proof of service by the process server or delivery service will be filed shortly.

[ ]   by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below. A copy of the consignment slip is attached to this proof of service.

### (See Attached Service List)

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on February 23, 2012, at Los Angeles, California.

Brittany Auchard

## Service List

Gregory Johnson vs HSBC Bank USA, National Association, et al.
United States District Court – Southern District of California Case No. 3:11-cv-2091-JM-WVG

<u>Authorized Agent for Defendant HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR THE ELLINGTON TRUST SERIES 2007-1</u>
c/o C T Corporation System
818 W. Seventh St.
Los Angeles, California 90017

<u>Attorneys for Defendant BANK OF AMERICA, N.A.</u>
Stuart W. Price, Esq.
Sean D. Muntz, Esq.
Christina G. Rothschild, Esq.
Bryan Cave LLP
3161 Michelson Drive, Suite 1500
Irvine, California 92612